A. I believe March of 2002.
Q. And the last date that was charged in the indictment?
A. September 9th of -- September 3rd of 2000.
Q. So that's a little over a year and --
A. Year and a half.
Q. Year and a half ago?
A. Yes.

MR. WILHELM: Thank you. No further questions.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY DEFENDANT THIGPEN:

Q. Good afternoon, Mrs. Hunter.
A. Hello.
Q. Okay. How long have you worked at the Attorney General's Office as an investigator?
A. Almost six years.
Q. How long have you been a certified accountant?
A. I passed my exam and got my certificate in January of '94.
Q. So you have been working as an investigator and an accountant?
A. You mean at the Attorney General's Office?
Q. Yes. At the Attorney General's Office.
A. I guess I'm an investigative auditor, so I do

SCANNED
OCT 24 2005
U.S. DISTRICT COURT ST. PAUL

Exhibit #2

investigations and auditing type work, yes.
Q. So you would have the information of what you needed to put the case together, is this correct?
A. I'm not sure of the question.
Q. You have all the information that you need to put the case together as far as if they went to Regents Hospital, you have that, and you could look Regents Hospital up, is that correct?
A. We did get the records from Regents. I guess I'm not clear on what you're asking.
Q. What I'm getting to, what I'm leading to is, who checks and balances you? Where is your check and balance?
A. I'm not --
Q. When I'm referring to a check and balance is if I would be referring to the president and the legislature and the senate. Who checks and balances you?
MR. WILHELM: Objection. Relevancy. We're all part of the executive branch, Your Honor.
THE COURT: Well, I understand. If the question is who supervises her?
DEFENDANT THIGPEN: Yeah. That's what I'm basically getting to.
THE WITNESS: Should I answer that question?
THE COURT: Why don't you answer that question?
THE WITNESS: My supervisor I guess would be our

chief investigator, Kate Morton-Peters.

BY DEFENDANT THIGPEN:

Q. So she would look over everything you did, right?

A. No. She would be our supervisor, but she doesn't read over everything that we've done.

Q. So she takes your word that everything is true and nothing has been tampered with and everything is just like it's supposed to be, so she never checks on a case like this that everything is in line?

A. Well, she did her part of the case, and I did my part of the case.

Q. Okay. So therefore she didn't look at what you did?

A. No, I don't think she did.

Q. So who looked at what you did?

A. I guess I'm not -- not --

Q. Who looked over your investigative work?

A. I think, the results of my work have been looked over by everybody involved in the case.

Q. Including Kate Morton-Peters?

A. She saw the summaries and everything that we did, so yeah, I guess.

Q. Okay. This gives you the great power over the case when you are both acting as the same person, is that correct?

A. I don't understand the question.

Q. Shouldn't you have had someone else do the accounting if you were an investigator?
A. I'm not sure of the question. This was my part of the case. I did the claims analysis. That's what I did.
Q. Does the Attorney General have another separate accountant, or are you the only accountant in the Medicaid fraud unit?
A. There is another investigative auditor in our division.
Q. Okay. Why wasn't she assigned the auditing position if you were going to be in the role as the investigator?
A. No. I'm the investigative auditor. That was my position, and that's what I did.
Q. Okay. You did say you got your information from the MMIS II system, correct?
A. I got the claims data from it, yes.
Q. And all the claims data are listed with the providers, correct?
A. Well, all the claims are billed by providers, so the provider would be listed.
Q. How did you get that information?
A. Well, we can log onto the system and pull it up by provider or by recipient or however we want to.
Q. So in this case, you got it by logging onto the system?
A. I got some of the data from logging onto the system. I got some data from the surveillance and integrity review

unit at DHS.

Q. What format did that come to you in?

A. The data from SURS?

Q. Yes, from the SURS.

A. Well, I got some data on CD and some data on floppy disk.

Q. Was it readable or unreadable?

A. It was readable.

THE COURT: That noise you're hearing is your breathing into the microphone, so just stay a little bit farther away.

THE WITNESS: I'm not having any luck with this.

THE COURT: It's very sensitive until you want to hear something, then it's not.

BY DEFENDANT THIGPEN:

Q. Okay. On September 19th, did you state that the data that the SURS gave you came in an unreadable format?

A. September 19th of when?

Q. 2000.

A. No, I don't believe I said that.

Q. I must remind you you're under oath.

A. Yes, I know. I don't believe I said that.

Q. Do you remember saying that right there? You can read that part of your statement (indicating).

A. Yes. This is correct. It says that SURS is able to

provide us data in a much more readable format.

Q. Could you keep reading?

A. Okay.

THE COURT: Don't read it out loud, please.

THE WITNESS: Read it out loud?

THE COURT: Do not.

THE WITNESS: Oh, do not. Okay.

BY DEFENDANT THIGPEN:

Q. Was it also in an ASCII 2 format?

A. That's what they provided me the data in, yes, that format.

Q. Everyone knows that ASCII 2 is unreadable, is that correct, unreadable?

A. No.

Q. So ASCII 2 is readable?

A. Yes.

Q. To the naked eye?

A. Yes. It's a universal format that you put data in to share among any type of system. It's a format that you put it in if you might share data in any system. It's a universal format. It's readable.

Q. So the disks that the SURS gave you, did you give that to the defense?

A. Yes, a copy of the data.

Q. Okay. Could you --

I'm going to lay a foundation with her with the disks.

THE COURT: Is this something that was introduced?

DEFENDANT THIGPEN: It's going to be introduced.

THE COURT: Has it been already, or do you want to?

DEFENDANT THIGPEN: Yeah, I want to.

THE COURT: Okay. I just turned off the jury monitor.

DEFENDANT THIGPEN: Okay. I think you turned off mine, too.

THE COURT: Is it white or dark?

DEFENDANT THIGPEN: Video input 2, no signal.

THE COURT: That's because it is not getting a signal. Where do you have it hooked up?

DEFENDANT THIGPEN: This one right here?

THE COURT: Which input do you have it hooked to, do you know?

DEFENDANT THIGPEN: VGA auxiliary 2.

THE COURT: 2?

DEFENDANT THIGPEN: Yeah. Video input, no signal.

THE COURT: Let's try 1. Don't touch it for a second. Let me just try something. I'm going to go

through this whole routine. It's not picking up the signal from -- through the cart.

Mr. Scott, do you know how he hooked it up?

MR. SCOTT: I don't know that it is up on his, either, Your Honor, from looking at his. I don't know that it's on his machine yet.

THE COURT: Do you just have a CD in your laptop?

DEFENDANT THIGPEN: Yes.

THE COURT: Has it been downloaded to the laptop?

DEFENDANT THIGPEN: Yes.

THE COURT: Have you actually shown it before so you know you can see it through the electronic means?

DEFENDANT THIGPEN: Yes.

THE COURT: We're pretty bad at this because it's worse if it doesn't have any input. Mr. Wilhelm, do you know how to do this?

MR. WILHELM: I'm not certain, Your Honor. I can try.

THE COURT: Hang on a second.

DEFENDANT THIGPEN: She says she can't tell just by looking at the CD.

THE COURT: I'm sure that is true. You're getting an input now of some sort. At least I am.

DEFENDANT THIGPEN: Yeah, this is it right here. There it is right there.

THE COURT: Can we hurry that along? Back when I used to try cases, we didn't have any of this, and the cases went much faster. I don't know quite why they went so fast.

Those of you on the jury, you can't see it because I've turned off your monitors, but Mr. Thigpen is attempting through his computer to get this CD up so that you can see it in a readable form, and his computer is a little slower than some that you might be familiar with. Maybe he has too much stuff loaded on it. I'm not sure.

DEFENDANT THIGPEN: Maybe she wants to look and see if this is her file.

BY DEFENDANT THIGPEN:

Q. Is this your file?

A. I don't see anything on here.

Q. Is your name Heidi Hunter?

A. It says this file is too large for note pad to open.

Q. Do you see Heidi Hunter? Do you see that?

A. You mean on the file listing?

Q. Yeah. The file listing?

A. That looks to be the beginning of a file name of mine. I don't have the full file name in front of me.

Q. Let me see if I can spread it out for you. There you go. That's your name, right, Heidi Hunter?

A. That is my name, yes.

Q. Are those your files?

A. Well, they could be my file names. As far as being the files we sent you I don't know because I don't know if you're looking at a CD that we sent you or a copy of a CD. I don't know what you're looking at.

Q. So you think someone made up a file with the Heidi Hunter name on it?

A. No. I said these look like the file names of the files that I looked at.

DEFENDANT THIGPEN: Any objection?

MR. WILHELM: Was that an offer of the exhibit?

THE COURT: I don't know. What are you offering?

DEFENDANT THIGPEN: I want her to say if these were her files, and I want to offer the disk.

THE COURT: From what I can see on the screen here at my desk and what other people are probably seeing and you're seeing is a whole lot of files that have been listed under part of your computer which has a file number of 01102 underscore 1401 D:, and there are at least 24 files.

Are you offering all of them? Only a few of them have Heidi Hunter's name attached to them.

DEFENDANT THIGPEN: Do I have to offer them, or can I just ask the question?

THE COURT: See, the problem is, in order for

this case to be heard by this jury, and they have to determine the facts that are proved in this case.

DEFENDANT THIGPEN: I would like to offer them.

THE COURT: Well, wait a minute, because I want to get to that second point. The second point is, in order to do that they have to be passed through some rules of evidence. You're getting familiar with those, I think.

DEFENDANT THIGPEN: Yes.

THE COURT: And the problem here is that there has to be a foundation laid for whatever it is you're going to offer. Now, I think that's what you're trying to do when you said are these your files, Ms. Hunter, and you showed her the file icon that is now showing on the screen with her name attached to them, and she gave you an answer which made sense to me, also.

I don't know if that's really my file, but my name is attached to it, and that's what she sees. What else are you going to try to offer is the question? Are you going to offer any one of these files?

DEFENDANT THIGPEN: Yes, the whole file.

THE COURT: All of them, the whole 1102?

DEFENDANT THIGPEN: Yes.

THE COURT: Underscore 1401?

DEFENDANT THIGPEN: Yes.

MR. WILHELM: Foundation objection.

THE COURT: Well, at this point that's a very good objection. I don't think any of us know what's in there, including Mr. Wilhelm.

DEFENDANT THIGPEN: I can show what is on there.

THE COURT: Just a minute. Is there somebody here, Mr. Wilhelm or Ms. Hunter, who knows what is on that disk?

MR. WILHELM: I think we can solve this problem if I can talk to you at the bench.

THE COURT: Let's come on up, please.

(Side-bar discussion.)

MR. WILHELM: We gave Mr. Thigpen a disk yesterday and on the record identified it as Defendant's Exhibit 4 and handed over a copy of that to Mr. Thigpen. Now, I assume that's what is in the computer is what we gave you, but I can't tell from looking.

DEFENDANT THIGPEN: I was going to pull up one file.

THE COURT: Can you answer the question he just asked you because this is why this computer stuff gets very complicated because of the foundation problem, and that's why we're being careful about it. I don't want you to be accused of showing something on the screen in front of the jury that is just right out of nowhere.

DEFENDANT THIGPEN: I understand what you're

saying.

THE COURT: Is the disk that they gave you which is marked Exhibit 4 the same disk that you are now showing us?

DEFENDANT THIGPEN: Yes, it is the one she made the spread sheets off of.

THE COURT: That's two different answers to one question.

DEFENDANT THIGPEN: Yes, it is.

THE COURT: Because she may not have made spread sheets off that disk at all. I don't know.

DEFENDANT THIGPEN: She stated it on the record. She stated the MMIS II. If you want to go back it's on the record.

THE COURT: I don't want to argue with you. What you have in your computer is the same as Defendant's Exhibit 4?

DEFENDANT THIGPEN: Yes.

THE COURT: It is for sure, positive?

DEFENDANT THIGPEN: Yes.

THE COURT: Positive, because you had another disk earlier.

DEFENDANT THIGPEN: Those were the same information.

MR. WILHELM: Whether they were or weren't, we

know what we gave him yesterday is Exhibit 4.

THE COURT: Are you willing to be --

MR. WILHELM: I'm not trying to be a problem here, but I want to make sure that nobody has been modifying any evidence.

MS. PETERSON: There was another 4, but he marked another 4 today.

THE COURT: Didn't I make him skip that?

MR. WILHELM: In any case, if I could have Mr. Thigpen's assurance that he hasn't modified any of the contents of the disk that we gave him and we have identified here as Exhibit 4, then I have no foundation objection because it's what we gave him.

THE COURT: Is that true?

DEFENDANT THIGPEN: Yes. I haven't modified anything.

THE COURT: It is the same disk?

DEFENDANT THIGPEN: Yes.

THE COURT: What I'm going to do is receive Exhibit 4, which is this disk, and you're saying what was on the screen is this disk, and if there is any problem with that, Mr. Wilhelm is going to let us know. Okay?

DEFENDANT THIGPEN: It's not a problem.

(In open court with the Jury present.)

THE COURT: Members of the Jury, so you

understand what has happened, Defendant's Exhibit -- I want to make sure that the record is clear. It is. Defendant's Exhibit 4 is a CD which you have been seeing bandied around here. That CD has now been received, and that is the evidence, the CD.

Now, we're going to have to make sure you have a readable device in the jury room with you when you go to deliberate so you can look at this yourself, but you have been told there is a lot of material on this CD.

It was provided to Mr. Thigpen by the government so that they have no objection to it, assuming that what is on the CD is what they gave him. They're not quite ready to give up on that, but we're going to go ahead and receive Exhibit 4, which is the CD itself, and Mr. Thigpen I think is now --

Maybe you are about to show us what is on the CD via the computer once we get to that. So what I'm going to do is take off the monitor and --

DEFENDANT THIGPEN: It's ready.

BY DEFENDANT THIGPEN:

Q. Is this your disk?

A. I don't know. It looks to be data that I received. I can't say for sure that it is my disk, but this looks to be data that I did receive from SURS.

Q. It came in this format?