A. It came in this format.

Q. And this is ASCII 2 format?

A. Yes.

Q. So you did not have to convert it?

A. No. It's readable text.

Q. On September 19th, did you say, I requested the specific fields that I wanted, and they pulled those fields for us. So when I made the request, I said I wanted the recipient's name, the recipient's ID, the date of service, the amount paid and the procedure, and that type of thing?

A. Are you talking about the -- in 2000 again?

Q. Yeah, 2000 again.

A. Yeah, that sounds like something I said.

Q. Is this the MMIS II data?

A. It is my understanding that this is data that comes from MMIS system. This is data again I requested from SURS.

Q. Is Larry Woods correct by saying that the data is unreadable?

A. I don't know what Larry Woods has said in the past. All I know is that we are able to access the MMIS data and that we can read it.

Q. And that you can read it. Okay. September 19th, did you say, again, that was another data download from the SURS which I imported into Excel. It is from the MMIS II

SCANNED
OCT 24 2005
U.S. DISTRICT COURT ST. PAUL

system, is that correct?

MR. WILHELM: Your Honor, object to the use of the prior inconsistent statement in that it is not inconsistent and constitutes hearsay.

THE COURT: Well, I understand your objection. I'm going to overrule it at this point, at this juncture.

Go ahead and answer the question if you can. You may.

THE WITNESS: Well, as I just previously stated, I believe it is data from the MMIS system that we requested from SURS.

BY DEFENDANT THIGPEN:

Q. So what fields did you tell whoever it was you got the data download from, what fields did you request?

A. The fields that are listed here.

Q. And what --

A. Last name, first name, recipient ID, date of service, procedure code, name of the procedure code and procedure code modifier, the units paid, the provider number, the provider name, amount submitted, amount allowed, amount reimbursed, the date paid, which is called warrant date, and then the claim type.

Q. Where on this --

Your Honor, excuse me. How do I draw?

THE COURT: It still draws just like it did

before, I think.

MR. WILHELM: I could help him, Your Honor. He just needs to push a button.

THE COURT: Okay.

BY DEFENDANT THIGPEN:

Q. If there is a download from the Department of Human Services, I think you can draw here, where is the logo that says it's from the Department of Human Services?

THE COURT: Do you want to tap in the lower right-hand side and get rid of those? Right there. Just tap. Did you get it off yours?

DEFENDANT THIGPEN: Yes.

BY DEFENDANT THIGPEN:

Q. Could you show the jury and the Court where the department of human service logo is on this data?

A. We don't get our data that way.

Q. How does it come?

A. Like this.

Q. With no logo or anything?

A. No.

Q. So how do we know it came from who you say it came from?

A. I believe somebody from SURS can answer that question than me. I know it came from SURS because that's who gave it to me.

Q. Why is it titled Heidi Hunter files?
A. That's just what the SURS investigator named it when he did the file.
Q. So someone came up with your file?
A. I'm sorry?
Q. Someone else came up with your file?
A. I don't understand what you mean. He named it with my name because I'm the person that requested it.
Q. So it shouldn't have been entitled Attorney General Thigpen case docket number?
A. I have no control over how SURS names their files.
Q. Who is the SURS who gave you this file?
A. This is Paul Xiong.
Q. Paul Xiong. Could you tell the Court and I why there is no TCN number on this?
A. I didn't request that field.
Q. What is a TCN number?
A. It's an identifier to identify each claim.
Q. That's important, isn't it?
A. I don't know what you mean. It's important to DHS. It's not necessarily important for claims analysis.
Q. TCN number, isn't that like a social security number?
A. It's a unique code for each claim so that they can find it if they need to look it up on the system again or something.

Q. Okay. Was the disk ever taken out of the office?
A. No, I don't believe so.
Q. You don't believe so or yes or no. Was it taken out of the office?
MR. WILHELM: Objection. Asked and answered.
THE COURT: Sustained.
BY DEFENDANT THIGPEN:
Q. Okay. So you are familiar with computers, correct?
A. Yes.
Q. If you modify something, if I was going into it now and touch something, it would leave a record that I have been in it and I touched it, is that correct?
A. Only if you save the change to the file.
Q. But it would let me know that it's been modified, correct?
A. It would ask you if you wanted to overwrite the file when you're saving it.
Q. Did you ever do any overtime work on this particular case?
A. Probably for trial preparation.
Q. And what date was that?
A. I couldn't tell you time leading up to this trial.
Q. Okay. It's going to be a paper that comes from this disk. The laptop does not have the capability to print it, but there is a paper that comes from this disk that has

dates you modified it and dates that you also, this disk was modified at eleven o'clock at night.

What were you doing at eleven o'clock at night with the disk?

A. I have no idea what you're talking about.

Q. Are you calling the computer a liar?

A. No. I just have no idea what you're talking about.

Q. On September 19th, did you say, I'm sorry?

A. I can't answer that question. I don't know.

Q. You don't know?

A. I don't know.

Q. Let me let you read it to yourself.

Are you familiar with this? I'm sorry. Read this one.

A. Okay.

Q. Okay. So that does state that again that was another data download from the SURS which I imported. What does the word "imported" mean?

A. It means I brought the data into Excel and saved it into an Excel format.

Q. So it was in a different format, right?

A. It's in the ASCII limited text file, and I bring it into Excel and save it as an Excel file.

Q. Either it's in text format or ASCII 2 format. So when you stated this, which one was it in?

A. It was an ASCII limited text file is what it's called.
Q. Did you create this information?
A. This file here?
Q. Yes.
A. No.
Q. If they were to do a data download and put a disk or a floppy into the MMIS system, wouldn't it yank all the providers out of there?
A. I can't answer that question. I don't work for SURS.
Q. You have the same access to the MMIS II system, is that correct?
A. I don't have this access from which they pulled this data to my knowledge.
Q. At the beginning, you said you were able to log on?
A. Yes, we are.
Q. Huh?
A. Yes, we are.
Q. So you're able to do a data download, correct?
A. I'm able to save data from the MMIS system, not in this format.
Q. What format are you able to save them in?
A. You have copies of those files in here.
Q. I'm asking so that the Court can hear.
A. It's just a screen print of data from the MMIS system.
Q. So it doesn't need to be converted or anything. You

just get, stick it in and plug it out?
A. It's just a screen print. We go through, and we can pull up screens, and you can print them either to a piece of paper or to file, and then I can bring those files into Excel again.
Q. Do you know James Jasper?
A. I know of him. We've never talked or anything.
Q. So is he incorrect when he says that you can't do a data download because the elements unreadable?
MR. WILHELM: Objection. Mischaracterization of the testimony. Improper cross.
THE COURT: Sustained. I think it's been asked and answered also.
DEFENDANT THIGPEN: Okay.
BY DEFENDANT THIGPEN:
Q. Now, what fields did you tell the SURS unit that you wanted?
A. The ones that were just mentioned here. I don't have the screen up again, so I can't see them.
Q. So it was no provider field?
A. Well, yes. The provider name and provider number.
Q. If you did a data download to the providers, all the providers would come up, correct?
A. Just for this recipient because I requested by recipient, so all the providers for this specific

recipient.
Q. Okay. Could you read this for me for a second to yourself, not out loud.
A. Okay.
Q. On September 19th, you stated, Generally, no, because it is really impossible to do a good data analysis using the MMIS as we have it because, as I said, a lot of the data, you have to go through a lot of different screens to apply the data that we would just get all together and do a download from the SURS.
Is that correct?
A. Yes.
Q. So if it's impossible to do a good analysis, how could you just pull up claims from this system?
A. That's why I requested all these files from SURS.
Q. During the course of the year, did you keep going back and get data downloads?
A. No. What I did, during the course as the case went on and time went on, because the number of claims built during the time we looked at during the time period we looked at would get smaller and smaller, I just looked them up then on our system.
It was easier to do it that way. There were a lot fewer claims than there were at the beginning.
Q. You just said you could not get a good analysis from

your system, is that correct?
A. If I tried to do this from scratch with just the MMIS data, it would have been difficult, but I didn't start off just doing that with just our access to the MMIS system.
Q. So does the defendant have the SURS data you kept going back to get?
A. Well, you have the SURS data here, and you have copies of the data that I got when I did my subsequent reviews from the MMIS system.
Q. So you made those up because on September 19th you stated that you can't get a good analysis from your system, is that correct?
A. If I had done it from the beginning from scratch, it would have been very difficult to do, but like I said, we've got the SURS data, so it was a lot easier to do it in that format, and then as time went on, I could look on our system just to see if there were any more new claims that came in or not.
Q. Do you have to build the data or do a data download, which one is it?
A. I'm sorry?
Q. Do you have to build this? This information in front of us, do you have to build that?
A. I didn't create this file. SURS did.
Q. Do they have to build it?

A. I don't know how they did it.
Q. Okay. I'll let you read this. Read it to yourself. September 19th, you stated no to build the data, not necessarily to analyze it. So did you build this?
A. No. That I think comment is taken out of context with the question that I was asked prior to that. That has nothing to do with this.
Q. I asked you before. Did you build this?
A. No, I didn't build this. This is from SURS.
Q. On September 19th, I asked you, you stated, to analyze and to go through all the screens and pull all the data that we needed to do the analysis?
MR. WILHELM: Objection. Asked and answered at least twice.
THE COURT: Sustained. Hit a key on your computer. You just timed out on us.
BY DEFENDANT THIGPEN:
Q. Just read this to yourself.
A. I already read this. You already showed me this.
Q. No. This is a different one. Okay. This is a different one.
MR. WILHELM: Objection to the improper use of a prior inconsistent statement. 618, Your Honor.
THE COURT: I'm going to sustain the objection. I think it's argumentative also.

BY DEFENDANT THIGPEN:

Q. Are you the one that did the hospital analysis also?

A. Kate Morton-Peters was the one that did the primary analysis. I did also look at the hospital records as part of my analysis.

Q. Top one. Read the top one.

A. Okay.

Q. September 19th, did you state --

MR. WILHELM: Same objection.

DEFENDANT THIGPEN: I haven't asked the question. This is a different question. I haven't even started.

MR. WILHELM: Same objection.

THE COURT: Well, the objection has been that you're not using the previous statement in an appropriate way.

DEFENDANT THIGPEN: That's not it.

THE COURT: And so -- and I'm not going to give you a lesson on how to do that, but Mr. Wilhelm is correct. You're not doing it correctly, and that's why I sustained the last objection.

DEFENDANT THIGPEN: Okay.

THE COURT: So I'm going to sustain it again.

DEFENDANT THIGPEN: Okay.

THE COURT: But that's why lawyers go to law school for years.

BY DEFENDANT THIGPEN:

Q. Do you recall on September 19th of 2000 while you were working stating, No, it was the data. It was the data download that we received from the SURS. So it came from the MMIS II system, and it comes in a different format that we just didn't put into spread sheets. I didn't create this spread sheet. It was data that was imported from data that we had from SURS, and it was from the MMIS II system, and it was all of the claims from all of the charges and things, all of the other medical claims from all of the charges.

A. I'm sorry. What is your question?

THE COURT: What is the question? Did she say that?

DEFENDANT THIGPEN: Huh?

THE COURT: Is the question did she say that at some previous time?

DEFENDANT THIGPEN: Yes. That's what the question was.

MR. WILHELM: Objection. Calling for hearsay response in that it is not inconsistent with her prior testimony.

THE COURT: Well, I'm going to sustain the objection because that's exactly right, and just so you understand, Mr. Thigpen, what I mentioned to you at the

side-bar is, if you can show that this witness has said something that's different today than she said at a previous time under a sworn statement, then you can do that to show her lack of credibility.

But she has been testifying to the same things, and she has not said anything that I can hear or remember that is inconsistent with what you just read. That's why Mr. Wilhelm objected, and I sustained it.

DEFENDANT THIGPEN: Yes, Your Honor. If I would address the Court, it is inconsistent because she said it came in ASCII 2 text, and if you would like to take a look at it.

THE COURT: I heard it.

DEFENDANT THIGPEN: She said it came from ASCII 2 text, so her statement is --

THE COURT: Ask her if she disagrees with the statement you just read.

BY DEFENDANT THIGPEN:

Q. Do you disagree with the statement I just read?

A. No.

THE COURT: So it's consistent. That's the problem that Mr. Wilhelm objected to, and that's why I'm sustaining.

DEFENDANT THIGPEN: Well, she just said she got it in ASCII 2 format and ASCII 2 format was readable.

THE COURT: We're not going to go through and instruct you on rules of evidence, and I don't think Ms. Hunter is going to give you an instruction on what she is talking about when she is talking about various computer systems. That's another problem.

BY DEFENDANT THIGPEN:

Q. So did you get it in readable or unreadable format?

A. It was readable. It looked just like this.

DEFENDANT THIGPEN: So that is consistent?

THE COURT: From what I heard it is. You may not believe so, but from what I'm listening to, and we will let the jury decide. The jury has to decide. They're the final decision makers, and they can decide whether they believe even what you said and what this witness said are inconsistent. That's their choice. They will have to do that.

BY DEFENDANT THIGPEN:

Q. Okay. Could you tell us why there is not special transportation on this disk that you got from the SURS?

A. There might be if you page down further.

Q. Page down, okay. Tell me when.

A. There you go.

Q. Okay. That's what we are going to get to. You see where it says nonemergency special transportation right there?

A. Yes.
Q. Why isn't that field on the top of this disk?
A. That is the name of the procedure code. It is a field at the top of the disk.
Q. So are you familiar with the warehouse, the data warehouse?
A. No.
Q. So you guys have never been to the data warehouse?
A. No.
Q. So where is the SURS unit located?
A. At the Department of Human Services.
Q. Okay. Did you order all the -- are all the fields of all providers in that disk?
A. No.
Q. So would it be fair to say that Mr. Thigpen wouldn't get a proper analysis if they're not all there?
A. I can't answer that question. I was able to do a proper analysis.
Q. And how was that?
A. Because I had all the fields I needed. All I needed to know is, is there a date of service and who was the medical provider.
Q. All that you needed to know, right?
A. Yes. I just said that.
Q. Did you have access to the MMIS II system if wanted it